Michael F. Ram (SBN #104805)
Susan S. Brown (SBN #287986)
Aaron M. Sheanin (SBN # 214472)
ROBINS KAPLAN LLP
2440 West El Camino Real
Suite 100
Mountain View, CA 94040
Telephone: (650) 784-4040
Facsimile: (650) 784-4041
MRam@RobinsKaplan.com
SBrown@RobinsKaplan.com
ASheanin@RobinsKaplan.com

Hollis Salzman
Kellie Lerner
Benjamin D. Steinberg
ROBINS KAPLAN LLP
399 Park Avenue, Suite 3600
New York, NY 10022
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
hsalzman@robinskaplan.com
klerner@robinskaplan.com
bsteinberg@robinskaplan.com

*Attorneys for Plaintiffs Kaylani Ross and Dee Lenz*
*[additional counsel on signature page]*

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KAYLANI ROSS and DEE LENZ, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

WELLS FARGO & COMPANY, WELLS FARGO BANK, N.A., D/B/A WELLS FARGO DEALER SERVICES, NATIONAL GENERAL HOLDINGS CORP., and NATIONAL GENERAL INSURANCE COMPANY,

Defendants.

No. ________________________

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiffs Kaylani Ross and Dee Lenz, on behalf of themselves and all others similarly situated nationwide, bring this action against Defendants Wells Fargo & Company, a Delaware Corporation, Wells Fargo Bank, N.A., a National Banking Association, doing business as Wells Fargo Dealer Services (together "Wells Fargo"), National General Holdings Corp., and National General Insurance Company, formerly known as GMAC Insurance (together "National General") (collectively "Defendants"). Plaintiffs, by and through their attorneys, allege as follows based on information and belief and investigation of counsel:

**INTRODUCTION**

1. In the latest example of Wells Fargo's recurring practice of defrauding its own customers, Wells Fargo has admitted to engaging in a long-running scheme that forced hundreds of thousands of customers of automobile financing to unwittingly pay for automotive insurance they did not need, leading to hundreds of thousands of erroneous loan delinquencies and tens of thousands of illegal vehicle repossessions.

2. The scheme was first reported by the *New York Times* on July 27, 2017 after the *Times* obtained an internal, non-public report commissioned by Wells Fargo executives that estimated that more than 800,000 people who financed car loans through Wells Fargo were wrongfully charged for force-placed Collateral Protection Insurance ("CPI") despite having insurance of their own. By forcing hundreds of thousands of customers to purchase the unnecessary CPI insurance, which was underwritten by National General, and by then automatically deducting the CPI premiums from customers' bank accounts, Wells Fargo earned millions of dollars in interest payments, penalties, fees, and kickbacks in the form of commission payments.

3. Wells Fargo's customers, in turn, were subjected to deceptive late fees, insufficient fund charges, wrongful repossessions, and downgraded credit scores, even after many customers complained directly to Wells Fargo.

4. Only after the *Times* article was published did Wells Fargo publicly acknowledge the scheme, finally admitting that "customers may have been charged premiums for CPI even if they were paying for their own vehicle insurance, as required, and in some cases the CPI premiums may have contributed to a default that led to their vehicle's repossession."

5. Among the victims of the scheme were Plaintiffs, who co-signed on an auto loan financed through Wells Fargo and were forced to pay for CPI underwritten by National General despite maintaining their own insurance coverage and despite demanding that Wells Fargo stop charging them for the CPI. As a result of Wells Fargo's failure to do so, Plaintiffs were unable to keep current on their loan payments, which ultimately resulted in the repossession of their vehicle.

6. Plaintiffs bring this action on behalf of themselves and a Nationwide Class comprised of all other persons in the United States who obtained an automotive loan through Wells Fargo Bank, N.A. or its subsidiaries or divisions, and who were charged for CPI and/or related fees at a time when the vehicle subject to the loan was covered under a separate automobile insurance policy. Plaintiffs also bring this action on behalf of a Tying Sub-Class comprised of all persons in the United States who obtained a dealer-arranged automotive loan through Wells Fargo Bank, N.A. or its subsidiaries or divisions ("Wells Fargo") at a dealership at which Wells Fargo was a preferred or primary lender, and who were charged for CPI and/or related fees at a time when the vehicle subject to the loan was covered under a separate automobile insurance policy.

**JURISDICTION AND VENUE**

7. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this lawsuit has been brought as a class action on behalf of thousands of Class members, the aggregate claims of the putative Class members exceed $5 million exclusive of interest and costs, and one or more of the members of the putative Classes are citizens of a different state than each of the Defendants. This Court also has jurisdiction under 28 U.S.C. §§ 1331 and 1337 because this action arises under the Racketeer Influenced and Corrupt Organizations Act, the Sherman Act, and the Bank Holding Company Act.

8. This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §§ 1961, 1962, and 1964.

9. Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22. The Defendants transact business in this District and are subject to personal jurisdiction here, and a substantial part of the events giving rise to the claims occurred in this district.

**INTRADISTRICT ASSIGNMENT**

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

10. Pursuant to Local Rule 3-2(c), assignment to the San Francisco or Oakland Division is appropriate because "a substantial part of the events or omissions which give rise to the claim occurred" there.

**PARTIES**

11. Plaintiff Ross is currently a resident and citizen of Wisconsin, and at all times relevant to this complaint was a resident and citizen of Wisconsin.

12. Plaintiff Lenz is currently a resident and citizen of Wisconsin, and at all times relevant to this complaint was a resident and citizen of Wisconsin.

13. Defendant Wells Fargo & Company is a corporation and bank holding company organized under the laws of Delaware with its principal place of business in San Francisco, California. Wells Fargo & Company is one of the nation's largest corporations, providing a wide-range of financial services to customers throughout the United States.

14. Defendant Wells Fargo Bank, N.A., ("Wells Fargo Bank") is a national association bank chartered in South Dakota and headquartered in San Francisco, California. Wells Fargo Bank is Wells Fargo & Company's principal subsidiary, and Wells Fargo & Company exercises control over Wells Fargo Bank's policies and practices. Through Wells Fargo Dealer Services, Wells Fargo Bank originates and services loans to customers that are secured by those customers' vehicles.

15. Defendant National General Holdings Corp. is a Delaware corporation and insurance holding company headquartered in New York, New York.

16. Defendant National General Insurance Company is a Missouri corporation headquartered in Winston-Salem, North Carolina, and is a subsidiary of National General Holdings Corp. National General Insurance Company provided insurance tracking services to Wells Fargo and underwrote the CPI policies that Wells Fargo billed to Plaintiffs and the Class members.

**FACTUAL ALLEGATIONS**

**A. Wells Fargo Deceptively Charged Hundreds of Thousands of Automotive Loan Customers for CPI They Did Not Need, Exacting Profits at Borrowers' Expense**

17. To protect its collateral, lenders often require borrowers to maintain insurance on

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

collateral as a condition for financing a loan. When borrowers do not have their own insurance, lenders sometimes force borrowers to purchase insurance through the lender.

18. While this so-called "force-placed" or "lender-placed" insurance is common in the home mortgage industry, it is significantly less common in the automotive loan industry. Most other major auto loan providers, such as Bank of America, Citibank, and JPMorgan Chase, do not force borrowers into such policies. One primary reason for this is that drivers are already required to maintain auto insurance to legally operate their vehicles in most states.

19. Nonetheless, beginning in or around 2006, Wells Fargo began requiring its automotive loan customers to maintain insurance coverage on the vehicles securing the customers' loan. If a customer did not maintain their own insurance, or was otherwise unable to provide evidence of such insurance, Wells Fargo forced the customer to purchase lender-placed insurance underwritten by National General. Such insurance is commonly referred to Collateral Protection Insurance, or "CPI."

20. To determine whether a borrower had his or her own auto insurance, and thus whether the borrower would be charged for force-placed CPI, Wells Fargo sent the borrower's information to National General, which purportedly used a database to track the borrower's insurance status. If Wells Fargo and National General determined that a borrower lacked the requisite automobile insurance, or if their insurance had lapsed, Wells Fargo was legally required to notify the borrower and request that the borrower provide proof of insurance. If the borrower was unable to do so, Wells Fargo was required to disclose to the customer that it was forcing the customer to purchase CPI. Conversely, if the borrower *did* have the requisite auto insurance, Wells Fargo was not permitted to charge the customer for duplicative CPI.

21. This system, however, was largely ignored in practice. In reality, Wells Fargo frequently failed to notify borrowers of their insurance requirements and CPI charges, and routinely charged borrowers for CPI even when borrowers maintained their own independent insurance and notified Wells Fargo of the wrongfully placed coverage.

22. According to a Wells Fargo consultant, Wells Fargo's failures to notify customers of its CPI protocol and forced-placements violated the disclosure requirements of five states—

Arkansas, Michigan, Mississippi, Tennessee and Washington—with respect to nearly 100,000 policies between 2012 and 2016.

23. Because Wells Fargo often automatically deducted the CPI charges from customers' bank accounts, many customers never realized—or did not realize until after the fact—that they were being wrongfully charged for CPI that they never requested or needed.

24. Moreover, the force-placed CPI was often significantly more expensive than the automobile insurance that borrowers purchased on the open market.

25. These practices continued for several years despite repeated objections from customers that they were being charged for unnecessary CPI that was not properly disclosed. Not only did Wells Fargo not reimburse such customers for the wrongful CPI charges, in many cases, Wells Fargo continued assessing the charges on customers without explanation, leading to increased fees, delinquencies, and repossessions, as described below.

26. On an online database managed by the Consumer Financial Protection Bureau, customers lodged the following complaints relating to Wells Fargo's force-placed insurance practices:

> **07/26/2016**: After paying our car loan with Well fargo Dealer Service XXXX CA for the month of XXXX XXXX we receive[d] a call that stated that our payment was still outstanding because they had applied some insurance to our auto loan. We explained to the representative that we have always carried ins with XXXX XXXX without lapses. She state[d] it was a[n] easy fix and for us to call the insurance company to have them send over proof of insurance which we did the same day and call back the next day to be sure it was taken care of. The rep assure[d] us that all the charges would be remove. and because this was an error it would not be reported on our credit (This was very important because we were in process of getting a home loan and needed our credit to remain constant). However, on XXXX XXXX XXXX we find that Well Fargo have placed a 30 day late report on our credit that caused our credit to fall XXXX points and our chance for the American Home Dream to slip away. When we called to ask what happen to this very simple correction they gave us several excuses and apologize only to say it would take them 30 to 45 days to correct after we submit a written dispute, again prove ins, send copies of credit reports and show credit when down before they would take this off of our credit reports. We have fought very hard to restore our credit and have waited 7 years after a for[e]closure to bring up our credit and to be able to buy a home again, only to have a big bank come along and wipe out our chances without concern for their error or the detriment that it cause hard working, bill paying American families. Any help you can offer in expediting this credit restoration would be very appreciated Thank you in advance for your assistance.

> **11/09/2015**: Wells Fargo Dealer Services has contin[u]ously overcharged for the auto loan on my 2006 XXXX and kept me uninformed about details of my loan and its terms.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

> 1 ) I just found out from a wells fargo dealer services representative that I was assessed/enrolled in comprehensive auto insurance through the Auto dealer XXXX at the time of the purchase as part of the re[q]uirement to qualify for the loan..At the time of the purchase I was not informed of this requirement. I was al[s]o asked to get a second comprehensive insurance for the duration of the loan which I also purchased independently. In essence I was asked to carry XXXX insurance policies on the same auto. 2 ) In reviewing my loan payments it appears my interest rate on the loan was raised without any notification. Wells Fargo Dealer Services reps have been extremely rude when inquir[]eing about my loan issues and very unco[o]p[e]rative with information about the details of the loan and its terms. 3 My car was repos[s]essed after only one month late on my loan payments. Fees and char[]ges for repossession, storage and penalties appear to be exce[s]sive. 4.Wells Fargo continues to charge for auto insurance ( wells fargo insurance ) even though I have comprehensive insurance on the my veh[i]cle and have notified them of it. . If and where there have been deliberate overcharging and exploitation I want a refund on the overcharges and exce[s]sive fees.

> **04/09/2015**: I am a single mother of XXXX who has been a loyal Wells Fargo customer for over 15 years. My loyalty stems from the fact that my family and I have XXXX accounts with Wells Fargo which is why I decided to use the Wells Fargo Dealer Services car loan service rather the other options that I had when I purchased my car in XX/XX/XXXX. . . Here is the brief about this case below : XXXX XXXX, Collections Manager is charging me for insurance when I already carry insurance through XXXX. This is a scam to steal funds from me! . . . I was surprised when my credit bureau report shows that I was reported late for late payment even though I had been paying my usual payment without including the Wells fargo added insurance since XXXX XXXX said it was taken care of[]. . . . In the mean time my credit worthiness is under attack and my FICO score has dipped negatively. The incorrect credit report needs to be corrected ; the late fees need to be removed ; and the harassing phone calls need to be stopped- XXXX XXXX continues to call me and that needs to stop!

27. Far from an innocent oversight, Wells Fargo and National General profited from this systematic deception in several significant ways. As part of a revenue sharing agreement with National General, which reportedly ended in 2013, Wells Fargo received a kickback, in the form of a commission payment, each time it placed a CPI policy with a customer. For its own part, National General generated revenue from the underlying sale of each CPI policy.

28. Wells Fargo also derived significant revenue in the form of increased interest payments by manipulating the order in which customers' monthly payments would be applied to their various loan-related fees. Specifically, Wells Fargo structured the order so that monthly payments would (1) first apply to the loan interest, (2) second to CPI interest, (3) next to the loan principal, (4) then to CPI principal, and (5) finally to payment variance, (6) CPI Variance, and (7) other charges. This sequence ensured that payments were less likely to be applied to pay down existing principal, thus increasing the overall interest that borrowers paid Wells Fargo over the

course of their loan.

29.    Additionally, because many customers chose to have their auto loan payments automatically deducted from their bank accounts, the undisclosed CPI charges often increased customers' monthly payments beyond what was available in their accounts, leading customers' accounts to be overdrawn. This resulted in additional revenue for Wells Fargo in the form of overdraft fees and other penalties.

30.    As a result of these policies, Wells Fargo's practice of forcing CPI on borrowers who already had insurance served as a profitable revenue stream for Defendants, incentivizing Defendants to ignore customer complaints and continue their deceptive and illegal practices for nearly a decade.

31.    Wells Fargo's practices directly harmed its customers on a number of fronts. Borrowers were forced to pay millions of dollars in premiums for insurance they did not need, in addition to the extra interest and overdraft fees described above.

32.    In many instances, these additional costs led to loan delinquencies that resulted in the repossession of borrowers' vehicles, sometimes on repeated occasions. Indeed, even after such vehicles were repossessed and sold, Wells Fargo continued to demand that borrowers make additional payments to pay off the loan.

33.    Such credit delinquencies have caused many borrowers' credit ratings to be downgraded, leading to further injury in the form of decreased access to credit and/or higher interest rates and fees from other lenders.

**B.  Wells Fargo Acknowledges the Scheme, But Only After It Was Revealed by the *New York Times***

34.    On July 27, 2017 the *New York Times* first publicly reported on the scheme in an article titled "Wells Fargo Forced Unwanted Auto Insurance on Borrowers." Among other things, the article reported that Wells Fargo's executives had commissioned an internal investigation and report in July of 2016, prepared by the consulting firm Oliver Wyman, which found that more than 800,000 of Wells Fargo's auto loan customers were wrongfully billed for duplicative CPI, roughly 274,000 customers were pushed into delinquency, and almost 25,000 vehicles were repossessed.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

35. After the article was published, Wells Fargo, for the first time, publicly acknowledged the CPI scheme, but refused to admit the scope of the harm detailed in the Oliver Wyman report. In a statement, Wells Fargo admitted that "customers may have been charged premiums for CPI even if they were paying for their own vehicle insurance, as required, and in some cases the CPI premiums may have contributed to a default that led to their vehicle's repossession."

36. The CPI-related revelations are not isolated incidents for Wells Fargo; rather, they are only the latest in a series of recurring scandals involving Wells Fargo's exploitation of its own customers.

37. For example, the Department of Justice has sued Wells Fargo on behalf of members of the armed forces whose cars were illegally repossessed in violation of the Servicemembers Civil Relief Act. Wells Fargo agreed to pay $20 million in civil penalties and roughly $4 million in reimbursement to service members who were harmed.

38. Wells Fargo has also faced lawsuits and been assessed $190 million in fines relating to revelations that it instructed branch employees to open millions of unauthorized credit card and bank accounts. The scandal led to the resignation of Wells Fargo's former CEO, John Stumpf.

39. Most recently, on August 4, 2017, Wells Fargo disclosed that it was investigating whether it wrongfully charged customers for fees to extend interest rate lock periods on residential mortgages, as well as harm caused by freezing or closing deposit accounts for suspected fraud.

40. The latest CPI-related misconduct has raised concerns among analysts regarding the lack of oversight and compliance at Wells Fargo. Isaac Boltansky, an analyst at Compass Point Research & Trading explained that "[t]he steady drip of revelations is concerning as it makes quantifying and qualifying the extent of the internal control failures difficult." *See* Fortune, *Wells Fargo May Have Charged 500,000 Clients for Unwanted Insurance*, July 28, 2017. Christopher Wheeler, an analyst with Atlantic Equities, echoed the same sentiment, remarking that "[w]hat has been shown is that the bank was run for superior revenue growth, and the controls around managing that were clearly insufficient." *Id.*

**PLAINTIFFS' ALLEGATIONS**

41. In May of 2014, Plaintiffs Ross and Lenz financed the purchase of a 2009 GMC Envoy with a loan from Wells Fargo, which they both co-signed.

42. At the time of the purchase, Plaintiffs Ross and Lenz had automobile insurance through Geico.

43. When their Geico insurance policy lapsed, Wells Fargo began billing Plaintiffs for force-placed CPI, which included higher monthly premiums than what Plaintiffs had paid under the Geico policy.

44. After Plaintiffs Ross and Lenz re-obtained their own auto insurance, they instructed Wells Fargo to stop charging them for the force-placed CPI.

45. Wells Fargo, however, did not do so. Wells Fargo continued to bill Plaintiffs for the duplicative CPI.

46. As a result of the unnecessary and duplicative CPI premiums, Plaintiffs were unable to keep current on their loan payments. Their loan ultimately became delinquent and their vehicle was repossessed.

**TOLLING OF THE STATUTE OF LIMITATIONS**

47. At the time, Plaintiffs and members of the Class did not know, and could not have discovered through reasonable diligence, the true nature and scope of Defendants' forced-place CPI scheme.

48. Despite Defendants' continuous duty to disclose to Plaintiffs and the members of the Class the true character, quality, and nature of the CPI-related charges, Defendants knowingly and actively concealed the CPI scheme, and Plaintiffs and members of the Class reasonably relied upon Defendants' concealment.

49. Given such concealment, as evidenced by Defendants' refusal to disclose Wells Fargo's internal investigation and report into its auto-loan business until it was first revealed in the press, Plaintiffs and Class members had no reasonable opportunity to discover the extent and character of the CPI scheme until the July 27, 2017 *New York Times* article.

50. Accordingly, any applicable statutes of limitations have been tolled by operation of

the discovery rule and the doctrine of fraudulent concealment. Further, Defendants are estopped from relying on any statutes of limitation in defense of this action.

**CLASS ACTION ALLEGATIONS**

51. Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and the following Class and Sub-Class:

> **Nationwide Class:** All persons in the United Sates who obtained an automotive loan through Wells Fargo Bank, N.A. or its subsidiaries or divisions, and who were charged for CPI and/or related fees at a time when the vehicle subject to the loan was covered under a separate automobile insurance policy.

> **Tying Sub-Class:** All persons in the United Sates who obtained a dealer-arranged automotive loan through Wells Fargo Bank, N.A., or its subsidiaries or divisions, at a dealership at which Wells Fargo was a preferred or primary lender, and who were charged for CPI and/or related fees at a time when the vehicle subject to the loan was covered under a separate automobile insurance policy.

52. Excluded from the proposed Class and Sub-Class are Defendants, their agents, officers, and directors, and their families, as well as its parent companies, subsidiaries, and affiliates, and any judicial officer assigned to this case. Plaintiffs reserve the right to revise the definition of the Class and Sub-Class based upon subsequent investigation.

53. This action is brought and may be properly maintained as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3).

54. Numerosity/Impracticability of Joinder**:** The members of the Class are so numerous that joinder of all members would be impractical. The proposed Class likely contains tens or hundreds of thousands of members. The precise numbers of members can be ascertained through discovery of documents in the possession of Wells Fargo and National General.

55. Commonality and Predominance**:** The action involves common questions of law and fact that predominate over questions affecting individual members of the Class. Such common questions include, but are not limited to, the following:

a. Whether Wells Fargo unlawfully charged borrowers for CPI who maintained separate automobile insurance;

b. Whether Wells Fargo wrongfully charged borrowers fees and interest and/or repossessed vehicles as a result of forced CPI placements;

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

c. Whether Defendants failed to disclose or otherwise concealed material facts to borrowers regarding its CPI policies;

d. Whether Wells Fargo knew or should have known that it and National General failed to properly confirm whether borrowers had independent automobile insurance coverage;

e. Whether Defendants violated the federal statutes listed in the causes of action below;

f. Whether Defendants violated California Business and Professions Code §§ 17200, et seq.

g. Whether Defendants have been unjustly enriched; and

h. Whether and to what extent Plaintiffs and members of the Classes are entitled to actual damages, statutory damages, treble damages, punitive damages, restitution, restitutionary disgorgement, and/or other equitable or declaratory relief.

56. Typicality: Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and the members of the Class have been injured by Defendants' unlawful conduct relating to force-placed CPI policies.

57. Adequacy**:** Plaintiffs are willing and prepared to serve as representatives of the Class and will fully and adequately assert and protect the interests of the Class. Plaintiffs have retained class counsel who are experienced and qualified in prosecuting class actions. Neither Plaintiffs nor their attorneys have any interests contrary to or in conflict with the Class.

58. Superiority: A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all members of the Class would not be economically feasible and is procedurally impracticable. While the Class in the aggregate sustained damages in the millions of dollars, the damages suffered by individual Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims. It would therefore be impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford litigation, the prospect of individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By

contrast, treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.

59. This action presents no difficulties in management that would preclude maintenance as a class action.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**Asserted on Behalf of Plaintiffs and the Nationwide Class**
**Violation of Racketeer Influenced and Corrupt Organizations Act ("RICO")**
**18 U.S.C. § 1962(c)-(d)**

60. Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

61. Plaintiffs bring this Count on behalf of themselves and the Nationwide Class against Defendants for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964 for violations of 18 U.S.C. § 1962, *et seq.*

62. Plaintiffs, each member of the Class, and Defendants are "persons," as that term is defined in 18 U.S.C. §§ 1961(3) and 1962(c).

63. Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

64. Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions, such as 18 U.S.C. § 1962(d).

65. As set forth below, over the course of nearly a decade, Defendants sought to extract millions of dollars from Plaintiffs and the Class by billing them for unnecessary and undisclosed CPI policies in violation of sections 1962(c) and (d).

**A. The CPI Enterprise**

66. For purposes of this claim, the RICO "enterprise" is an association-in-fact, as the term is defined in 18 U.S.C. §§ 1961(4) and 1962(c), consisting of Wells Fargo & Company,

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

Wells Fargo Bank, National General Insurance Company, and other Non-Parties affiliated with the RICO Enterprise, such as their respective officers, directors, employees, agents and direct and indirect subsidiaries (the "CPI Enterprise"). At all relevant times, each member of the CPI Enterprise was aware of the enterprise's conduct, was a knowing and willful participant in that conduct, and reaped profits from that conduct.

67.    While each member of the CPI Enterprise acquired, maintained control of, was associated with, and conducted or participated in the conduct of the enterprise's affairs, at all relevant times, the enterprise: (a) had an existence separate and distinct from each of its members; (b) was separate and distinct from the pattern of racketeering in which the Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including Defendants, along with other individuals and entities, including unknown third parties.

68.    Alternatively, each of the above-named entities constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the members of the enterprise conducted a pattern of racketeering activity. The separate legal statuses of the members of the CPI Enterprise facilitated the fraudulent scheme and provided a hoped-for shield from liability for Wells Fargo and its co-conspirators.

69.    The CPI Enterprise is an ongoing and continuing business organization consisting of "persons" within the meaning of 18 U.S.C. § 1961(3) that created and maintained systemic links for a single common purpose: to profit from unnecessary CPI auto insurance policies charged to borrowers who did not need them.

70.    The CPI Enterprise's members are systematically linked through contractual business arrangements, financial ties, and coordinated activities. Since at least 2006, Wells Fargo and National General engaged in the following coordinated efforts to achieve the CPI's Enterprise's goal: When a borrower obtained an auto loan from Wells Fargo, Wells Fargo sent the borrower's information to National General, which purportedly used a database to determine whether the borrower had independent insurance coverage. When National General notified Wells Fargo that a customer did not have the requisite independent insurance, Wells Fargo added a CPI policy to the customer's loan without notifying the customer and then billed the customer for premiums for the

CPI policy.

71. Wells Fargo and National General could not have achieved the goals of the CPI Enterprise without one another's assistance, and both Wells Fargo and National General reaped profits from the scheme. National General profited as the underwriter of the CPI policies, while Wells Fargo earned profits in a number of ways, including by earning commissions on each policy (until 2013) and through the receipt of increased interest payments and fees.

72. Wells Fargo and National General regularly communicated and exchanged information about customers and insurance to facilitate the enterprise's goals. This communication typically occurred, and continues to occur, using the wires and the mail.

73. The CPI Enterprise's members operated as a continuing unit for the purposes of implementing the scheme, through which each member agreed to actively hide the existence of the scheme and the enterprise from others.

74. Therefore, Wells Fargo and National General participated in the conduct of the CPI Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343.

75. As part of the CPI Enterprise, Wells Fargo and National General intentionally made material misstatements regarding, among other things: (1) whether a customer required a CPI policy; (2) Wells Fargo and/or National General's protocol for assessing a customer's eligibility for a CPI policy and/or an auto loan; (3) Wells Fargo and National General's relationship, (4) the true terms and conditions of obtaining an auto loan through Wells Fargo; and; (5) the true cost of obtaining an auto loan through Wells Fargo.

76. In the absence of the above misrepresentations and borrowers' reliance on them, the CPI Enterprise could not have achieved its common purpose.

77. The CPI Enterprise engaged in and affected interstate commerce by, among other things, advertising, setting, and affecting the price and terms of auto loans and/or insurance policies that were obtained by thousands of Class members throughout the United States, its territories, the District of Columbia, and the Commonwealth of Puerto Rico. The terms of the auto loans and

insurance policies mandated that Class members make monthly insurance payments in interstate commerce to Wells Fargo.

78. The CPI Enterprise's harmful effects can be felt to this day. Wells Fargo and National General continue to charge borrowers for CPI policies, irrespective of whether they are required under the loan's terms.

**B. Conduct of the CPI Enterprise**

79. Wells Fargo exerted control over the CPI Enterprise and participated in the operation or management of the affairs of the CPI Enterprise, directly or indirectly, by, among other ways: (1) misrepresenting the terms of its auto loans to its customers upon their initial application and throughout the application process; (2) transmitting loan applications and other customer information to National General; (3) misrepresenting the role that National General played in the loan application process; (4) issuing and/or authorizing unnecessary or unauthorized CPI policies; (5) concealing the true nature of its relationship with National General; (6) paying and receiving payment from National General; (6) issuing monthly statements to Class Members including fraudulent charges; and (7) collecting monthly payments from Class Members for those charges.

80. The hierarchical decision-making structure of the CPI Enterprise was headed by Wells Fargo. Wells Fargo controlled the terms and cost of auto-loans it issued, determined who those loans would be issued to as well as when and if a customer's application and/or information would be sent to National General for review. Wells Fargo directed National General regarding its review of auto loan policies and, ultimately, issued the CPI policies underwritten by National General and collected upon them.

81. National General also participated in the conduct of the affairs of the CPI Enterprise, directly or indirectly, in the following ways: (1) underwriting the CPI policies issued by Wells Fargo, with knowledge of Wells Fargo's fraudulent intent; (2) reviewing auto loan applications with the aim of issuing CPI policies; (3) paying commissions to Wells Fargo for each CPI placement; (4) transmitting loan applications and other customer information to Wells Fargo; (5) misrepresenting its role in the loan application process; (6) authorizing the issuance of unnecessary or unauthorized CPI policies; and (7) concealing the true nature of its relationship with Wells Fargo.

82. Defendants also directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present.

**C. Wells Fargo and National General's Pattern of Racketeering Activity**

83. As part of carrying out, or attempting to carry out, the scheme to defraud its customers, Wells Fargo and National General knowingly conducted or participated, directly or indirectly, in the affairs of the CPI Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.

84. By way of example, Defendants and their co-conspirators have either committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

85. Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

a. **Mail Fraud**: Wells Fargo and its co-conspirator National General violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to sell the CPI policies described herein by means of false pretenses, misrepresentations, promises, and omissions.

b. **Wire Fraud**: Wells Fargo and its co-conspirator National General violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

86. The CPI Enterprise's pattern of racketeering likely involved thousands of separate instances of use of the U.S. Mail or interstate wire facilities in furtherance of the enterprise's scheme. Many of the precise dates of such instances have been deliberately hidden, and cannot be specifically alleged without access to materials in the possession of Defendants.

87. Nonetheless, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

communications to perpetuate and maintain the CPI Enterprise's scheme, including the things and documents described above.

88.    Wells Fargo's and National General's use of the mails and wires also includes, but is not limited to: (1) marketing materials regarding Wells Fargo and/or National General's auto loans and insurance policies sent throughout the country by wire and mail; (2) mail and wire communications between Wells Fargo and National General establishing their relationship with respect to the CPI Enterprise and the issuance of auto loans and/or CPI policies; (3) the electronic or physical submission of auto loan applications and other customer material from Wells Fargo to National General for approval regarding CPI policies; (4) National General's written or electronic response to those applications and requests for information from Wells Fargo; (5) written, telephone, or electronic communications regarding and/or negotiating CPI premium rates; (6) the transmission and/or distribution of CPI policy documents through the mails; (7) the use of the mails or wires to bill for or collect revenues, and/or profits from CPI policies; (8) written and electronic communications to government agencies, including but not limited to the Office of the Insurance Commissioner regarding the CPI policies issued and underwritten by National General; and (9) the use of the mails or wires to communicate regarding the administration and conduct of the CPI Enterprise.

89.    Additionally, Wells Fargo and National General communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, and other third-party entities for the purpose of furthering the CPI Enterprise's scheme.

90.    Wells Fargo and National General knew, and intended that, Plaintiffs and the members of the Classes would rely on the material misrepresentations and omissions made by them and would incur increased costs as a result. Had Plaintiffs and the Classes not made unnecessary payments for CPI policies, the CPI Enterprise's scheme could not have succeeded.

91.    Each of these fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which Wells Fargo and National General intended to defraud Plaintiffs, members of the Class, and

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

other intended victims.

92.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and the Class.

93.    The mail and wire transmissions described herein were made in furtherance of the CPI Enterprise's scheme and common course of conduct designed to fraudulently extract revenue from and the Class.

94.    The pattern of racketeering activity alleged herein and the CPI Enterprise are separate and distinct from each other. Likewise, Wells Fargo and National General are distinct from the CPI Enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

95.    As described herein, Wells Fargo and National General engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of extracting money from Plaintiffs and the Class through their misrepresentations and omissions, while forcing them to pay for unnecessary and unwanted CPI policies. The predicate acts also had the same or similar results, participants, victims, and methods of commission.

96.    Far from occurring in isolation, Defendants engaged in the above acts as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

97.    Defendants further aided and abetted those unnamed entities in the violations of the above laws.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

**D. The Harm Caused by the CPI Enterprise**

98. As a result of Wells Fargo's and National General's conduct, primarily their pattern of racketeering activity, Plaintiffs and the Classes have been injured in their business and/or property in multiple ways, including but not limited to paying for unnecessary auto insurance premiums, interest, fees, and incurring downgraded credit.

99. Defendants' violations of 18 U.S.C. §1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiffs and the members of the Class, entitling them to seek treble damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**SECOND CAUSE OF ACTION**
**Asserted on Behalf of Plaintiffs and the Nationwide Class**
**Violations of California's Unfair Competition Law**
**(Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

100. Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

101. Plaintiffs bring this Count on behalf of themselves and the Nationwide Class against Defendants.

102. California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq., protects both consumers and competitors by promoting fair competition in commercial markets for goods and services. California's Unfair Competition Law is interpreted broadly and provides a cause of action for any unlawful, unfair, or fraudulent business act or practice. Any unlawful, unfair, or fraudulent business practice that causes injury to consumers falls within the ambit of California's Unfair Competition Law.

103. Within California, Wells Fargo engages in substantial sales and marketing of its financial products and services and is headquartered in San Francisco. National General operates in California through its agreements and collaborations with Wells Fargo.

104. As described herein, Defendants' misconduct towards its auto loan customers constitutes unlawful, fraudulent, or unfair business practices, insofar as (1) such conduct violates numerous statutes as described herein; (2) any justification for such conduct is outweighed by the

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

harm caused to Plaintiffs and the Class members; (3) such conduct is immoral, unethical, oppressive, unconscionable, or substantially injurious to Plaintiffs and Class members, and/or; (4) such conduct has a tendency to, and did in fact, deceive Plaintiffs and Class members.

105. Defendants' unlawful, unfair, and fraudulent business acts and practices, as described above, include, but are not limited to, wrongfully charging auto loan customers for unnecessary CPI policies, refusing to cancel CPI policies despite proof of existing coverage, failing to notify customers of the imposition of CPI coverage, structuring payments in a self-serving manner to maximize the interest payments charged to customers, wrongfully sending its borrowers' accounts to collections, and repossessing their vehicles.

106. Plaintiffs and Class members have been damaged by these practices, which violate California's Unfair Competition Law Cal. Bus. & Prof. Code §§ 17200, et seq., and other similar state unfair competition and unlawful business practice statutes.

**THIRD CAUSE OF ACTION**
**Asserted on Behalf of Plaintiffs and the Nationwide Class**
**Unjust Enrichment**

107. Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

108. Plaintiffs bring this Count on behalf of themselves and the Nationwide Class against Defendants.

109. By virtue of their wrongful imposition of CPI policies and other charges and fees, and by the further omission of material facts related to its CPI policies, Defendants were unjustly enriched at the expense of Plaintiffs and members of the Class, and money belong to Plaintiffs and members the Class was unjustly taken by Defendants.

110. It would be inequitable and unconscionable for Defendants to retain the profit, benefit and other compensation they obtained from their fraudulent, deceptive, and misleading conduct alleged herein.

111. Plaintiff and members of the Class seek restitution from Defendants, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct.

**FOURTH CAUSE OF ACTION**
**Asserted on Behalf of Plaintiffs and the Tying Sub-Class**
**Illegal Tying in Violation of 15 U.S.C. § 1**
**(Violation of the Sherman Act)**

112. Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

113. Plaintiffs bring this illegal tying claim on behalf of themselves and the Tying Sub-Class comprised of all persons in the United Sates who obtained a dealer-arranged automotive loan through Wells Fargo Bank, N.A., or its subsidiaries or divisions, at a dealership at which Wells Fargo was a preferred or primary lender, and who were charged for CPI and/or related fees at a time when the vehicle subject to the loan was covered under a separate automobile insurance policy.

114. For purposes of this claim, the relevant geographic market is the United States. The relevant product market is the market for dealer-arranged auto loans at automobile dealerships where Wells Fargo was a preferred or primary provider of auto loans.

115. Within this product market, Wells Fargo has market power due to the unique competitive dynamics that exist at automobile dealerships with preferred lender relationships. Unlike in the broader market place, consumers seeking dealer-arranged auto financing at dealerships with preferred lender relationships are typically directed to a single lender or small group of lenders, often with minimal consumer input and without providing comparative offerings. Thus, at dealerships where Wells Fargo was a preferred or primary lender, Wells Fargo had appreciable market power when borrowers sought auto loans arranged by dealers.

116. Wells Fargo's sale of auto loans in this market is a separate product and/or service from the sale of automobile insurance. Most auto loan customers prefer, and do in fact, purchase automobile insurance separately from where they obtain automobile financing.

117. By forcing Plaintiffs and the members of the Tying Sub-Class to pay for unwanted CPI as part of obtaining an auto loan, Wells Fargo unlawfully tied its auto loans to the CPI policies underwritten by National General. Such illegal tying unreasonably restrains trade and is unlawful under Section 1 of the Sherman Act.

118. Moreover, there is no appropriate or legitimate business justification for Defendants

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

to force auto loan customers, such as Plaintiffs and members of the Tying Sub-Class, to also pay for automobile insurance.

119. Defendants' illegal tying practices have caused damage to Plaintiffs and the members of the Tying Sub-Class in violation of Section 1 of the Sherman Act.

**FIFTH CAUSE OF ACTION**
**Asserted on Behalf of Plaintiffs and the Tying Sub-Class**
**Violation of 12 U.S.C. § 1972**
**(Bank Holding Company Act)**

120. Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

121. Plaintiffs bring this claim on behalf of themselves and the Tying Sub-Class, as described above.

122. Wells Fargo is a bank within the meaning of 12 U.S.C. § 1971 and 12 U.S.C. § 1841(c).

123. Despite purporting to allow Plaintiffs and members of the Tying Sub-Class to maintain their own automobile insurance in lieu of purchasing CPI, in practice Wells Fargo required Plaintiffs and members of the Tying Sub-Class to purchase CPI in exchange for financing. Each such Class Member who obtained an auto loan from Wells Fargo was also charged for CPI, regardless of whether they maintained independent automobile insurance.

124. While not publicly disclosed at the time, Wells Fargo's functional requirement that certain auto loam customers purchase its CPI was unusual and not traditional in the banking industry.

125. As set forth above, Wells Fargo's extension of credit on the conditions set out above constituted an anticompetitive tying arrangement that violated 12 U.S.C. § 1972(1).

126. Wells Fargo's extension of credit on these terms benefited Wells Fargo because the force-placed CPI generated revenue for Wells Fargo in the form of kickbacks from National General, increased interest payments, and fees.

127. As a direct and proximate result of Defendants' violation of 12 U.S.C. § 1972(1), Plaintiffs have suffered damage and are entitled to treble damages pursuant to 12. U.S.C. § 1975.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

## PRAYER FOR RELIEF

128. Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against Defendants, as follows:

a. Certifying the Class, appointing Plaintiffs as representatives of the Class, and appointing the lawyers and law firm representing Plaintiffs as counsel for the Class;

b. Declaring Defendants' actions, as described herein, to be unlawful;

c. Permanently enjoining Defendants from performing further unfair and unlawful acts as alleged herein;

d. For all recoverable compensatory, statutory, and other damages sustained by Plaintiffs and the Class, restitution and/or disgorgement of Defendants' profits from its unfair and unlawful practices described above, and all other relief allowed under applicable law;

e. For costs;

f. For both pre-judgment and post-judgment interest on any amounts awarded;

g. For appropriate injunctive relief, including public injunctive relief;

h. For treble damages to the extent they are allowed by applicable laws;

i. For payment of attorneys' fees and expert fees as may be allowable under applicable law; and;

j. For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury as to all claims alleged in this action.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

DATED this 7th day of August, 2017.

By: */s/ Hollis Salzman*
Hollis Salzman
Kellie Lerner
Benjamin D. Steinberg
ROBINS KAPLAN LLP
399 Park Avenue, Suite 3600
New York, NY 10022
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
hsalzman@robinskaplan.com
klerner@robinskaplan.com
bsteinberg@robinskaplan.com

Michael F. Ram (SBN #104805)
Susan S. Brown (SBN #287986)
Aaron M. Sheanin (SBN # 214472)
ROBINS KAPLAN LLP
2440 West El Camino Real
Suite 100
Mountain View, CA 94040
Telephone: (650) 784-4040
Facsimile: (650) 784-4041
MRam@RobinsKaplan.com
SBrown@RobinsKaplan.com
ASheanin@RobinsKaplan.com

Roman M. Silberfeld
ROBINS KAPLAN LLP
2049 Century Park East,
Suite 3400
Los Angeles, CA 90067
Telephone: (310) 552-0130
Facsimile: (310) 229-5580
RSilberfeld@RobinsKaplan.com

Stacey P. Slaughter
ROBINS KAPLAN LLP
800 LaSalle Avenue
Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
Facsimile: (612) 339-4181
SSlaughter@RobinsKaplan.com

Shpetim Ademi
Mark Eldridge
ADEMI & O'REILLY, LLP
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Telephone: (414) 482-8000
Facsimile: (414) 482-8001
sademi@ademilaw.com
meldridge@ademilaw.com

*Attorneys for Plaintiffs Kaylani Ross and Dee Lenz*

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

75813646.1 - 26 - CLASS ACTION COMPLAINT